UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **LONGNECKER PROPERTIES, INC.** | **CIVIL ACTION** |
| **VERSUS** | **NO.** |
| **BP EXPLORATION & PRODUCTION, INC.** | **SECTION** |
| | **RULE 9(h)** |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**COMPLAINT FOR DAMAGES UNDER THE
OIL POLLUTION ACT, 33 U.S.C. §2701 ET SEQ.**

**TO THE HONORABLE UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF LOUISIANA AND THE JUDGES THEREOF:**

The Complaint of Longnecker Properties, Inc. (hereinafter "Longnecker"), a Louisiana corporation authorized to do and doing business in this state and judicial district at all material times, with respect represents:

1.

Made defendant herein is BP Exploration & Production, Inc. (hereinafter "BP Exploration" or "BP"), a Delaware corporation with its principal place of business in Warrenville, Illinois. BP Exploration was a lease holder and the designated operator in the lease granted by the former Minerals Management Service (now Bureau of Ocean Energy Management, Regulation and Enforcement) allowing it to perform oil exploration, drilling, and production-related operations in Mississippi Canyon Block 252 and drill the "Macondo" well where the blowout occurred and the oil spill originated. BP Exploration was designated as a

"Responsible Party" by the U.S. Coast Guard under the Oil Pollution of 1990 (OPA), 33 U.S.C. §2701.  This court has personal jurisdiction over BP Exploration, because BP Exploration is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

2.

At all material times, Longnecker was engaged in providing service personnel such as Riggers, Crane Operators, Roustabouts, Cooks, and Drilling, Workover, Production and Engineering Consultants to offshore oil and gas operators in the Gulf of Mexico.

3.

Longnecker has complied with the suit prerequisite contained in OPA by submitting a "sum certain" and a brief description of the claim as well as some supporting documentation to the Responsible Party, BP Exploration, thereby satisfying the presentment requirement described in 33 U.S.C. §2713. The claim has either been denied or not settled by any person by payment within 90 days after the date upon which the claim was presented.

4.

BP Exploration is the "Responsible Party" for the Oil Spill under OPA, 33 U.S.C. §2714. Because of the strict liability of Responsible Parties for all damages due to and arising from the Spill and its environmental devastation, Plaintiff does not need to set forth factual allegations to support culpability.  Nonetheless, out of an abundance of caution, Plaintiff sets forth the following factual allegations.

**BACKGROUND FACTS**

5.     At all times relevant herein, the vessel Deepwater Horizon was leased to BP for drilling exploratory wells at the Macondo prospect site, pursuant to the December 9, 1998,

Drilling Contract between Vastar Resources, Inc. and R&B Falcon Drilling Co. for RBS-8D Deepwater Horizon ("Drilling Contract"), and later amendments to that agreement.

6. On April 20, 2010, while temporarily abandoning a subsea oil well located at the Macondo prospect site in the area of the Gulf of Mexico known as Mississippi Canyon 252 ("Macondo well"), employees and agents of BP and its subcontractors aboard the vessel Deepwater Horizon lost control of the well and caused a massive blowout.

7. After the Deepwater Horizon sank, oil and gas gushed out of the damaged well and into the Gulf of Mexico for over twelve weeks, damaging and contaminating real and personal property, and doing immense and long-lasting damage to the environment and economies of the Gulf states and businesses, including Plaintiff and others working in and near the Gulf of Mexico. Meanwhile, BP downplayed the severity of the Spill and was unprepared for the massive clean-up effort required.

8. Prior to the Spill, BP had actual and/or constructive knowledge of significant problems related to the Deepwater Horizon's equipment and maintenance that could lead to loss of life, serious injury, and/or environmental damage, including problems with the vessel's Blowout Preventer ("BOP"), electronic fire and gas and alarm systems, computer software systems, purge air systems, and other vessel equipment.

9. Further, Defendants failed to plan, monitor, control, and contain the well, and failed to mitigate the risk and potential damages associated with deepwater drilling.

10. As described more fully below, the loss of well control and resulting harm was due to the negligent, reckless, callous, and grossly negligent actions on the part of BP and its subcontractors before, during, and after the blowout, including long-standing wanton misconduct by Defendants' corporate management.

## **PRE-BLOWOUT FACTS**

11.     BP and its subcontractors struggled with the high temperature, high pressure Macondo well repeatedly before the catastrophic events of April 20, 2010. In emails weeks before the blowout, BP employees referred to the Macondo well as "crazy," a "nightmare" well, and the "well from hell."

12.     Deepwater Horizon workers struggled to control the problematic well throughout drilling, having suffered numerous kicks, ballooning and lost return events due to the dangerous geological characteristics and narrow drilling margins at Macondo.

13.     As these problems caused the drilling schedule to fall farther behind schedule and over budget, BP and its subcontractors maintained an unreasonable rate of penetration in the drilling effort at Macondo to a point where drilling compromised the BP petrophysics crew's ability to predict down hole conditions and provide guidance on foreseeable hazards.

14.     Further, BP's drilling rate and failure to maintain a safe drilling margin violated federal regulations. On December 7, 2011, the federal Bureau of Safety and Environmental Enforcement ("BSEE") cited BP for four counts of violation of 30 C.F.R. § 250.427(b) for BP's knowing failure to suspend drilling operations at Macondo when the federally mandated safe drilling margin was no longer present in the well.

15.     Pursuant to its Drilling Contract, BP was paying approximately $500,000 per day to lease the Deepwater Horizon, not including contractors' fees. BP had planned for the drilling work at Macondo to take 51 days, at a cost of approximately $96,000,000.

16.     At the time of the blowout, drilling at Macondo was already months behind schedule, costing BP over $1 million per day in vessel lease and contractor fees and putting them increasingly over budget. This excess cost put the Macondo project in conflict with BP's recent

mandate of a 7% reduction in costs for all of its drilling operations in the Gulf of Mexico. In spite of the difficult and dangerous nature of the Macondo well, BP made multiple decisions about the drilling plan for purely economic reasons, even though those decisions introduced unnecessary risks and increased the risk of a catastrophic blowout of the well.

17. In order to reduce costs and save time on the dilatory and over-budget Macondo well, BP intentionally violated industry guidelines and government regulations, and ignored warnings from their own employees and contractors on the Deepwater Horizon.

18. This emphasis on speed and money over safety led to numerous errors and omissions by BP and its subcontractors, which, in turn, caused and/or contributed to the blowout and the subsequent Spill. Among these errors and omissions showing callous disregard for safety were the following:

   a. Decision to use a Long String instead of a Liner

   b. Decision to use six instead of twenty-one Centralizers

   c. Decision not to run a Bottoms Up Circulation

   d. Decision to pump a cement slurry that was defective in design, inadequately tested, and had a very low probability of success

   e. Decision to pump a defective cement slurry without waiting for all necessary cement slurry test results

   f. Decision not to run a Cement Bond Log

   g. Decision to run a positive pressure test without waiting for the cement to set

   h. Decision to run a negative pressure test without waiting for a full risk assessment

   i. Decision to displace to seawater before validating that a proper barrier to flow was in place despite clear signs that the cement did not work, zonal isolation and

>     well integrity had not been achieved, and that the hydrocarbons were likely to flow into the well.
>
> j.  Decision to order simultaneous operations to occur during critical abandonment phase

19. Given the history of the Macondo well, and the decisions BP made to save time and money completing the well, they should have been particularly attuned to any signs of trouble during the temporary abandonment phase on April 20, 2010. But instead of the requisite vigilance, BP and its subcontractors failed to properly monitor the well and ignored and/or missed an increasingly ominous series of warnings and red flags exhibited by the well in the hours before the fatal blowout.

20. As a result, BP and its subcontractors did not appreciate the severity of the well control situation until the mud began spilling out of the riser onto the vessel deck at about 9:41 p.m., 49 minutes after the leak had started at the bottom of the well.

21. BP has pled guilty to criminal charges, including eleven counts of seaman's manslaughter pursuant to 18 U.S.C. § 1115, for the grossly negligent actions of its employees and agents in failing to analyze properly the results of the negative pressure test and cease all operations at that time.

22. At approximately 9:48 p.m., the gas sucked into the Deepwater Horizon's engine #3 caused the engine to rapidly overspeed. The vessel lost power a minute later, followed by two explosions that ignited the gas enveloping the vessel. The blaze intensified as damage from the explosions and fire opened new flow paths for the flammable gaseous hydrocarbons spewing out of the well. These flow paths continued unabated until the vessel sank on April 22, 2010.

23. Decisions, tradeoffs, actions, and inactions by BP, including the risky well design, procedures that deviated from industry norms, and failure to identify and train for foreseeable risks all unnecessarily created and enhanced the risks associated with the drilling and temporary abandonment of the Macondo well. This reckless behavior culminated in insufficient well monitoring and failure to recognize the signs of an influx for 49 minutes prior to the blowout. Underlying it all, BP and its subcontractors' corporate cultures of trading risk identification and safety for speed, production, and profit made this catastrophe inevitable.

24. Leading up to the disaster on April 20, 2010, discord, recklessness, and gross negligence pervaded the actions of the BP onshore well team. E-mails from individuals such as Wells Team Leader John Guide and his supervisor, BP's operations leader at Macondo, Operations Manager David Sims, exemplified this callous disregard for human and environmental health and safety.

25. The substantial evidence of BP's misguided priorities and imprudent decisions regarding the Macondo well is all part of a long-standing culture of complacency in BP's deepwater drilling operations. Corporate leaders from Houston to London did not take potentially catastrophic risks of deepwater drilling seriously, did not identify foreseeable risks unique to deepwater drilling, and allowed those risks to result in the April 20, 2010 disaster.

## POST-BLOWOUT FACTS

26. On the night of April 20, after the explosions ignited the vessel, the resulting gas-fueled fire on the Deepwater Horizon raged for two days until she finally sank on April 22, 2010. The Deepwater Horizon was connected to the wellhead at the seafloor by a 5,000-foot marine riser pipe, and as the vessel sank to the seafloor, it dragged the riser down with it, bending and

breaking the pipe before finally tearing away from it completely. Immediately oil and natural gas began to gush from the open end of the riser and from at least two places along its twisted length.

27. For 87 days, the gushing oil and gas continued unabated, and the Spill's fast-growing oil slick made landfall on April 30, 2010, affecting increasingly larger areas of the Coastal Zone and ultimately the entire Gulf of Mexico.

28. From the outset, BP intentionally downplayed and concealed the severity of the Spill. BP's initial leak estimate of 1,000 barrels per day was found by government investigators to be a fraction of its actual measured leakage amount of 50,000 barrels per day. An internal BP document proves that the company's own analysis had shown that the rate of oil flow could reach as high as 100,000 barrels, or 4,200,000 gallons, per day.

29. Despite known existing technology and methods, BP Chief Operating Officer Doug Suttles admitted that as of April 20, 2010, BP did not have a response plan with "proven equipment and technology" that could contain the Macondo well. BP p.l.c. CEO Tony Hayward stated that "BP's contingency plans were inadequate," and that the company had been "making it up day to day." In its official statement, BP made the same admission: "All of the techniques being attempted or evaluated to contain the flow of oil on the seabed involve significant uncertainties because they have not been tested in these conditions before."

30. Upon information and belief, BP actually hindered efforts to kill the Macondo well and stop the flow of oil and gas into the Gulf waters. Engineers knowledgeable about deepwater blowout response told BP how to kill the well in June 2010. But BP chose to ignore the engineers' well-kill procedure because BP did not want to damage the well – or its chance to make a profit at Macondo. Because BP hoped to retap the Macondo well and its

massive reservoir, they intentionally ignored expert advice that could have killed the well many weeks earlier.

31. These gross failures and intentional acts ensured that this Oil Spill became the largest environmental disaster in the history of the United States.

32. Due to the events, actions, and inactions of BP described herein, commercial offshore activity in the Gulf of Mexico and surrounding waters ceased, and individuals and entities that rely on the use of the Outer Continental Shelf and its resources to generate revenues suffered both immediate and long-term economic harm.

**FOR A FIRST CAUSE OF ACTION**

33.

The April 20, 2010 blowout of the Macondo well and consequent explosion, fire, vessel sinking and massive oil spill prohibited Longnecker from engaging in its primary business activity of providing personnel to offshore operators in the Gulf of Mexico.

34.

BP Exploration was named the responsible party under the Oil Pollution Act, 33 U.S.C. §2701, et seq. ("OPA"), and is therefore strictly liable to Longnecker for economic damages that resulted from the blowout, explosion, fire and resulting massive oil spill.

35.

Commencing on April 20, 2010 and continuing through today and into the foreseeable future, Longnecker has suffered and will continue to suffer economic damages in the form of past and future lost revenues, lost business opportunities and diminution in asset values due to the April 20, 2010 casualty described herein, in amounts to be proven at trial of this cause.

36.

There were no other events, occurrences, actions or inactions that caused Longnecker's losses, no superseding or intervening cause(s) of Longnecker's losses, and no other events, occurrences, actions or inactions that factually or legally relieve or reduce BP Exploration's strict liability or the damages owed to Longnecker under OPA.

37.

Jurisdiction of this cause of action against BP Exploration is based upon the general maritime law of the United States.

38.

Jurisdiction also exists before this Court pursuant to the Oil Pollution Act, 33 U.S.C. § 2717(b).

39.

Longnecker brings all claims and causes under Federal Rule of Civil Procedure 9(h) and demands a trial by judge on said claims and causes.

**WHEREFORE**, based on the foregoing, Longnecker Properties, Inc. prays for judgment in their favor and against defendant BP Exploration & Production, Inc., for compensatory damages as alleged herein in an amount reasonable under the circumstances of this cause, for legal interest at the maximum allowable rate on those amounts for which Longnecker Properties, Inc. is entitled to obtain legal interest, for all reasonable claim preparation expenses, for litigation costs, and for any additional general and equitable relief as the facts of this cause may require.

Respectfully submitted,

        /s/ Paul M. Sterbcow
        PAUL M. STERBCOW, T.A. (#17817)
        IAN F. TAYLOR (#33408)
        JESSICA IBERT (#33196)
        Lewis, Kullman, Sterbcow & Abramson
        601 Poydras Street, Suite 2615
        New Orleans, Louisiana 70130
        (504) 588-1500
        (504) 588-1514    Facsimile
        sterbcow@lksalaw.com
        itaylor@lksalaw.com
        jibert@lksalaw.com

**PLEASE SERVE:**

**BP EXPLORATION & PRODUCTION, INC.**
Through their registered agent:
C T Corporation System
5615 Corporate Blvd., Ste. 400B
Baton Rouge, LA 70808